IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
DAVID E. HALFORD,            )
                             )
       Plaintiff,            )
                             )      CIVIL ACTION NO.
       v.                    )       2:09cv689-MHT
                             )          (WO)
WESTPOINT HOME, INC.,        )
                             )
       Defendant.            )
```

OPINION

Plaintiff David E. Halford filed this lawsuit against

defendant WestPoint Home, Inc. charging sex

discrimination in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e

to 2000e-17.[1]   Jurisdiction is proper pursuant to 28

U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-

5(f)(3) (Title VII).

---

1.   Halford's complaint also raises a claim of race
discrimination, but he has stipulated that he now
"pursues only a Title VII gender claim."   Order on
Pretrial Hearing at 10 (Doc. No. 46).

This lawsuit is before the court on WestPoint's motion for summary judgment. For the reasons that follow, that motion will be granted.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In conducting its analysis, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II.   BACKGROUND

On February 11, 2008, Halford was terminated from his employment as a maintenance supervisor at WestPoint's

Greenville, Alabama pillow plant.[2]  He had been employed by WestPoint since 2001.

Around January 2007, Dean Franklin became the plant manager at the Greenville pillow plant.  Later that year, Franklin and Cheryl McNaughton, the plant's human resources manager, conducted the plant's annual employee sexual harassment training.  Typically, all employees were trained together.  In 2007, however, WestPoint held separate sexual harassment training sessions for its male and female employees.[3]

_____

2.  For the sake of convenience, the court uses the term "WestPoint" to refer to the defendant, WestPoint Home Inc., and WestPoint Stevens, which WestPoint Home, Inc. apparently bought out of bankruptcy in 2005.  See Franklin Dep. at 14:1-18 (Doc. No. 27-20).  No legal significance should be inferred from the court's use of one term to refer to both entities.

3.  WestPoint decided to hold separate training sessions for male and female employees that year in order to address a problem specific to the men.  According to McNaughton, "There were some problems in the [men's] bathroom in the warehouse where some sexually-explicit graffiti had been put on the wall."  McNaughton Dep. at 229:23-230:1-3 (Doc. No. 27-17).

During the male training session, an employee "asked a question" about what would happen if someone accused a male employee of sexual harassment.   Halford Dep. at 131:22 (Doc. No. 27-1).   Franklin responded either, "Well, you better hope you got a witness, because if you don't got a witness, it's bye-bye," id. at 131:18-20, or "You better hope you got a witness because if you don't, you're gone," id. at 132:4-5.   Regardless of the exact wording of his response, the clear message was that a man accused of sexual harassment would be fired unless he had a witness to rebut the accusation.   "There is no evidence ... that Franklin or McNaughton informed the female employees that they would be subject to immediate termination if they were accused of sexual harassment and did not have a witness."   Pl.'s Br. at 2 (Doc. No. 32).

Franklin's response to the question is consistent with WestPoint's "Guidebook for Hourly Associates," which states that the company maintains a "position of zero tolerance regarding sexual harassment."   Guidebook at 4

4

(Doc. No. 27-2); see also Human Resources Policy Manual at 2 (Doc. No. 27-5) ("This policy affirms the Company's position of zero tolerance regarding sexual harassment of any kind.").[4]  The guidebook explains that:

> "[It is WestPoint's] policy to promote an atmosphere free of sexual harassment in any form at all levels of employment--including, but not limited to, unwelcome sexual advances, requests for sexual favors, spoken or written abuse related to an associate's sex, showing or displaying pornographic or sexually explicit objects in the workplace and other verbal or physical conduct of a sexual nature."

Id.  The guidebook explicitly "encourage[s] any associate who is subject to treatment he/she believes is sexual harassment ... to report it," and states that, "Charges of sexual harassment will be investigated immediately and

---

4.   There is no dispute that Halford had a copy of the guidebook, see def.'s ex. 2 to Halford dep. (doc. no. 27-3) (Halford's signed acknowledgment of receipt of WestPoint's Guidebook for Hourly Associates), or that he was aware of WestPoint's zero tolerance sexual-harassment policy, see Halford dep. at 67:7-11 ("Q: You understood that WestPoint Home had a zero tolerance sexual-harassment policy; right? A: Supposedly, but it went on all over the whole plant and [is] still going on.").

in a manner as confidential as possible." Id. The guidebook further indicates that "any associate who commits an intolerable offense will be promptly discharged." Id. at 40.[5] The non-exclusive list of "intolerable offenses" includes "[s]exual misconduct of a nature considered to be intolerable." Id. at 44.

On January 23, 2008, Halford and two other employees were standing outside a WestPoint building as Sherry Morgan, a payroll clerk and receptionist for the company, drove by in a company van. Morgan stopped near Halford and he approached the vehicle to speak with her. Halford described their ensuing interaction as follows:

> "Me and her was just talking. Where are you going? What are you doing? Something like that, you know, as always. ... [And] [s]he had a jacket. I don't know if it was [a] leather or whatever jacket, and a low-cut shirt with ... [her] [b]reasts hanging out. ... I reached with two fingers and caught just the corner [of her jacket

---

5. WestPoint also explicitly reserved the right to, "at its discretion, terminate an associate at any time for any reason." Guidebook at 30.

> and said,] 'All right ... junk like
> that's what gets all ... us guys in
> trouble with sexual harassment,' joking
> because me and Sherry been knowing each
> other a long time."

Halford Dep. at 150:14-151:11.  He later explained his actions by stating that, "[Her] boobs [were] hanging out [and] [t]hey [are] supposed to have a dress code."  Id. at 153:15-16.

A day or two later, Franklin and McNaughton summoned Halford to Franklin's office to discuss the above-described interaction with Morgan.  Halford agrees that, "They called [him] in because they thought that [his actions] could be considered sexual harassment."  Id. at 160:7-10.  He also recalls that during this meeting Franklin asked McNaughton, "Can anything be made out [of this?]," and she replied, "'Yeah, we can make something out of it.'"  Id. at 155:7-13.  Nonetheless, Halford was not disciplined at this time.  Indeed, by the time he left the office, "[t]hey were telling [him] that they were sorry that they [called him] up there; that they

made a mistake but they wanted to be sure." Id. at
159:22-160:1.

On February 5, 6, and 7, shortly after his meeting
with Franklin and McNaughton, Halford and two female
WestPoint employees, Fannie Ward and Michelle Rudolph,
attended a leadership training seminar in Montgomery,
Alabama. Each day of the seminar, the trio rode from the
Greenville plant to Montgomery and then back to the plant
in a company van driven by Halford.

Some time on the afternoon of February 7, Ward paid
a visit to McNaughton to complain about Halford's
behavior at and during their travel to and from the
seminar. After this visit, McNaughton typed the
following summary of Ward's complaints:

> "[Ward] [e]njoyed [the] classes in
> Montgomery, [but] did not enjoy [the]
> ride to and from.
>
> *David Halford started talking about
> sexual harassment, and being called to
> the front office about touching Sherry's
> breast, (called the people in the office
> sons of bitches). ...

8

*He talked about sexual things, referred to his penis[.] ... He said 'it ain['])t that big and it wont hurt you[.'] [He] talked about how long he could go, discussed his sexual relationship with his wife, talked about how he hurts her because he can go so long.

*He ask[ed] Fannie and Michelle which one of them would like to go first[.]

*He talked about oral sex[.] ...

*He made Fannie uncomfortable and afraid, she didn't know what he would do.  He was driving, she said a bunch of stuff went through her head, like was he going to take them off and meet some men and get raped, she ran through her head how she would defend herself.

*[He] made comments to the men in the class that made the men laugh when Fannie and Michelle walked into the room.

*[He] told Fannie and Michelle the other guys probably thought they were his whores[.]  He said they could probably make him some fast money, probably seven hundred dollars. [He] told Fannie that [a man] ask[ed] him 'ain't you got it yet?' referring to having sex with Fannie and Michelle.

Fannie felt like David didn't get in trouble for touching a white woman's breast, [so] she sure didn't feel like

9

> anything would be done because it was
> just words he used with her, not actual
> touching."

Def.'s Ex. 13 to Halford Dep. at 1 (Doc. No. 27-14).  The
next day, Ward signed and dated the document and added
the following handwritten note: "I, Fannie Ward[,] felt
like I had been rape[d] with my clothes on."  Id.; see
also Ward Dep. at 91:3-92:1 (Doc. No. 27-18).

McNaughton also met with Rudolph on February 7 to
discuss her experience with Halford over the days of the
seminar.  After this meeting, McNaughton typed the
following summary of her conversation with Rudolph:

> "[Rudolph] [e]joyed [the] classes in
> Montgomery, [but] did not enjoy [the]
> ride to and from.
>
> *David carried on about how he had sex
> every [day].
>
> *[He used] [v]ulgar language, Michelle
> even ask[ed] [him] if he could go to
> Montgomery and back with[out] cussing
> [and] the answer was no.
>
> * ... [He] [t]old [them] about [the]
> situation with Sherry and her shirt. ...

10

> *[He] made [the] comment that he should
> go back and tell people he made 700
> dollars off his whores.
>
> *He talked about the size of his penis.
>
> *[He] [m]ade comments about Fannie's
> 'big ass[.]'
>
> *[He] [m]ade Michelle feel very
> uncomfortable."

Id. at 2.  The next day, Rudolph signed and dated the
document.  Id.; see also Rudolph Dep. at 54:3-19 (Doc.
No. 27-19).

On Friday, February 8, McNaughton notified Franklin
of Ward and Rudolph's complaints, but Franklin "did not
discuss [the complaints] with [Halford] on that day."
Franklin Dep. at 204:4-5.  Rather, Franklin and
McNaughton waited until Monday, February 11, to summon
Halford to the plant's front office.  At that time,
Franklin told Halford that, "[T]wo ladies ... ha[ve]
filed complaint[s] that you talked profanity talk, and
we're going to have to let you go."  Halford Dep. at

11

201:7-11.[6]  Halford responded, "[T]ell me what I said,"
but Franklin declined to do so.  Id. at 201:15-16.
Halford has since "denie[d] making [most] of the remarks
that formed the basis of Ward and Rudolph's complaints to
McNaughton."  Pl.'s Br. at 3.[7]  At the time he was fired,
however, he was not given an opportunity to tell his side
of the story.

Following his termination, Halford filed this
lawsuit.  WestPoint responded with a motion for summary
judgment, which is now before the court.

_____

6.  Compare Compl. at ¶ 20 ("On or about February 11,
2008, [WestPoint], by and through Dean Franklin, met with
[Halford] and told him that two female employees, viz:
Fannie Ward and Michelle Rudolph, had accused [him] of
sexual harassment and that he was terminated.").

7.  Halford has admitted to commenting on Ward's
body.  He testified that: "[I'm] [n]ot going to lie. ...
I don't know if it was in a store or somewhere.  And I
said, 'Yep, Fannie walk[s] in, then her butt walks in.'
Now I said that."  Halford Dep. at 177:9-17.

### III.  DISCUSSION

Halford does not dispute that: (1) WestPoint has an official policy of "zero tolerance" for sexual harassment; (2) Franklin and McNaughton "called [him] in because they thought that [his January 23 interaction with Morgan] could be considered sexual harassment," Halford Dep. at 160:7-10; or (3), approximately two weeks later, Ward and Rudolph each filed sexual harassment complaints against him.  Nonetheless, he contends that WestPoint would not have fired him if he were not male.

Title VII of the Civil Rights Act of 1964 states that, "It shall be an unlawful employment practice for an employer ... to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."  42 U.S.C. § 2000e-2(a)(1).  "The two theories of intentional discrimination under Title VII are disparate treatment discrimination and pattern or

13

practice discrimination." Burke-Fowler v. Orange County,
447 F.3d 1319, 1322 (11th Cir. 2006). "Disparate
treatment claims[--like that brought by Halford--]can be
proven using direct evidence (requiring no inference or
presumption) or circumstantial evidence." Id. at 1323.
"The analytical framework and burden of production varies
depending on the method of proof chosen." Standard v.
A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

Halford claims that he has produced both
circumstantial and direct evidence that he was fired
because of his sex. For the sake of clarity, the court
addresses his offers of circumstantial and direct proof
separately.

## A. Circumstantial Evidence

When a plaintiff offers circumstantial evidence of
discriminatory intent, the court applies the "familiar
burden-shifting framework established in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36
L.Ed.2d 668 (1973), and subsequent cases." E.E.O.C. v.

14

Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).   "Under this framework, the plaintiff must establish a prima facie case of discrimination."   Id. "By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against [him]."   Id.   "The burden then shifts to the employer to rebut this presumption by producing evidence that its action was taken for some legitimate, non-discriminatory reason." Id.   "Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination."   Id. at 1272-73.   "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff."   Id. at 1273.

15

Halford may establish a prima face case of disparate treatment on the basis of sex by showing that: "(1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." <u>Burke-Fowler v. Orange County</u>, 447 F.3d 1319, 1323 (11th Cir. 2006).  It is undisputed that Halford can establish the first, second, and fourth elements of the prima-facie case.  The only question is whether he can provide a "comparator"; that is, whether he can prove that a "similarly situated" female employee was treated more favorably.

"When a claim alleges discriminatory discipline, to determine whether employees are similarly situated, [a court must] evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" <u>Id</u>. (citation omitted). "The quantity and quality of the comparator's misconduct

[must] be nearly identical to prevent courts from second-guessing employers reasonable decisions and confusing apples with oranges." <u>Rioux v. City of Atlanta</u>, 520 F.3d 1269, 1280 (11th Cir. 2008) (citations and quotation marks omitted).

Halford offers Fannie Ward as a comparator, arguing that: "Both [he] and Ward held supervisory positions at the plant ... [and] Ward ... is, therefore, a similarly situated comparator.   Further, several West[Point] employees have attested that Ward frequently engaged in intolerable sexual misconduct with her co-workers. Unlike [Halford], however, the complaints made about Ward's misconduct did not result in her termination." Pl.'s Br. at 9.

As evidence that "complaints made about Ward's misconduct did not result in her termination," Halford offers only a hand-written declaration from San J. Bone-Mack, who claims to have been employed by WestPoint "from

April 2001 until June 2005." Bone-Mack Decl. at 1 (Doc.

No. 32-2). Bone-Mack writes that:

> "[Ward] had a very flirtatious
> personality when working around the
> opposite sex, which is not appropriate
> in any workplace. ... While monitoring
> the lines shortly after [Ward] was
> hired[,] I heard her say to a guy, 'You
> need to let me spend some of that money
> you got.' ... When I got to work the
> next evening[,] someone ... had
> complained to my Production Manager.
> Two other people had overhead [Ward's]
> statement and there were complaints
> about her tight clothes. My Production
> Manager got on me for not saying
> anything to her because she was told I
> was standing ... there and didn't say or
> do anything about it. I was instructed
> to talk to her and let her know
> statements like that wouldn't be
> tolerated in the workplace. ... I told
> Fannie to watch what she said to other
> people. ... However, that Production
> Manager was terminated before she could
> terminate Fannie. Her replacement
> didn't care[,] he just enjoyed the
> scenery. I discussed the situation with
> the 1st Shift ... Coordinator and she
> told me not to worry about it because
> somebody would file sexual har[]assment
> charges on her sooner or later."

Id. at 1-2. Bone-Mack's declaration, however, is

unsworn. "Unsworn statements 'do[] not meet the

18

requirements of [Federal Rule of Civil Procedure 56]' and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (citation omitted). "Federal law does provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury." West v. Higgins, 346 Fed. Appx. 423, 426 (11th Cir. 2009) (unpublished) (citing 28 U.S.C. § 1746).  Bone-Mack's declaration contains no such averment.

Significantly, the court would not conclude that Ward is a "comparator" even if it could consider the allegations in Bone-Mack's unsworn declaration.  In the space of less than three weeks, Halford engaged in behavior with one female co-worker that even he acknowledges his supervisors believed "could be considered sexual harassment" and was the subject of detailed complaints of sexual harassment by two others.

It is unclear whether Bone-Mack alleges that <u>any</u> official sexual harassment complaint was filed against Ward.  More importantly, Ward's behavior as described by Bone-Mack pales in comparison to Halford's behavior as described by Ward and Rudolph.

It is also noteworthy that Bone-Mack left WestPoint in June of 2005, approximately one-and-one-half years before Franklin became the Greenville plant manager.[8]  To be sure, it is <u>not</u> the case "that a plaintiff cannot prevail as a matter of law whenever two different supervisors are involved in disciplining the plaintiff and [the] comparator[]."  <u>Anderson v. WBMG-42</u>, 253 F.3d 561, 566 (11th Cir. 2001) (finding that relevant precedent does not "support such a broad assertion").

_____

8.   It also appears that Ward herself did not become a supervisor until after 2007, further undermining Halford's above-noted contention that "[b]oth [he] and Ward held supervisory positions at the plant ... [and] Ward ... is, therefore, a similarly situated comparator." Pl.'s Br. at 9; <u>compare</u> McNaughton Dep. ("Q: Who would have promoted Ms. Ward [to supervisor]?  A: Mr. Franklin.").

Nonetheless, that fact that different supervisors made the relevant (alleged) decisions is an important consideration in determining whether Halford has identified a comparator. See Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312 n.7 (11th Cir. 1998) ("Different supervisors may have different management styles that--while not determinative--could account for the disparate disciplinary treatment that employees experience.").

In the absence of a comparator, Halford's efforts to establish a prima-facie case of sex discrimination hinge on Franklin's statement during the male sexual harassment training session: "You better hope you got a witness [if you are accused of sexual harassment] because if you don't you're gone." Halford Dep. at 132:4-5. But this

21

statement, without more, is not sufficient to create a
presumption that WestPoint discriminated against Halford
on the basis of his sex.    Indeed, as noted above,
Franklin's statement is consistent with WestPoint's
policy for addressing "intolerable" sexual harassment.[9]
What is lacking is any evidence that Franklin, or any
other WestPoint representative, indicated that this same
rule would <u>not</u> be applied to female employees accused of
sexual harassment.   Halford argues only that "[t]here is
no evidence demonstrating that Franklin or McNaughton
informed the female employees that they <u>would</u> be subject
to immediate termination if they were accused of sexual
harassment and did not have a witness."   Pl.'s Br. at 2
(emphasis  added).    Any  inference  from  Franklin's
statement to the conclusion that the same rule would not

---

    9.   The  court  will  not  second-guess  Franklin's
apparent  determination  that  Halford's  behavior
constituted "intolerable" sexual harassment.   Moreover,
the court notes that the question at issue in a Title VII
case is not whether an employer followed its written
procedures, but whether its actions amounted to unlawful
discrimination.

apply to female employees is especially tenuous given the fact that Franklin made the statement in response to a question.

Even if Halford had established a prima-facie case of discrimination, WestPoint has carried its burden of "producing evidence that [the challenged employment] action was taken for some legitimate, non-discriminatory reason." Joe's Stone Crabs, 296 F.3d at 1272. WestPoint maintains that, "Halford's employment was terminated because he engaged in intolerable sexual misconduct in violation of WestPoint's sexual harassment policy." Def.'s Reply at  1 (Doc. No. 36).

Halford has not met his burden of proving that "the proffered reason really is a pretext for unlawful discrimination." Joe's Stone Crabs, 296 F.3d at 1272-73. He cannot carry this burden by simply asserting that Ward and Rudolph lied; that is, that he did not do and say the things they claim.  "The law is clear that, even if a Title VII claimant did not in fact commit the violation

with which he is charged, an employer successfully rebuts
any prima facie case of disparate treatment by showing
that it honestly believed the employee committed the
violation." <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th
Cir. 1989).   This is because a Title VII claimant
alleging sex discrimination "must show not merely that
the defendant's employment decisions were mistaken but
that they were in fact motivated by sex." <u>Wilson v. B/E
Aero., Inc.</u>, 376 F.3d 1079, 1092 (11th Cir. 2004).

Nor has Halford produced evidence that Franklin did
not believe that Halford had committed the acts alleged
by Ward and Rudolph.   To be sure, Franklin initially told
Halford that he was terminated for "profanity talk," but
this explanation is not inconsistent with termination for
sexual harassment.

Of course, "[t]he evidence of pretext may include ...
the same evidence offered initially to establish the
prima facie case." <u>Wilson</u>, 376 F.3d at 1088.   In this
case, however, the court finds that Halford has failed to

establish a prima-facie case.  For the same reasons, it would reject any argument that his evidence demonstrates pretext.

In sum, "[g]iven the factual record in this case, [the court finds that it is] being urged to do nothing more than second-guess a business decision made by [WestPoint]."  Rojas v. Florida, 285 F.3d 1339, 1344 (11th Cir. 2002).  "This kind of inquiry--whether a business decision is wise or nice or accurate--is precluded by [law]."  Id.

### B.  Direct Evidence

Halford contends that Franklin's statement during the male sexual harassment training session--"You better hope you got a witness [if you are accused of sexual harassment] because if you don't you're gone"--is direct evidence of discriminatory intent.  The Eleventh Circuit has severely limited the type of language constituting direct evidence of discrimination, holding that "'only the most blatant remarks, whose intent could mean nothing

25

other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." <u>Wilson</u>, 376 F.3d at 1086 (citation omitted); <u>see</u> <u>also</u> <u>Merritt v. Dillard Paper Co.</u>, 120 F.3d 1181, 1189 (11th Cir. 1997) ("Evidence that ... is subject to more than one interpretation ... does not constitute direct evidence."). As should be clear from the analysis above, Halford's evidence falls far short of this standard.

In any event, the record evidence overwhelmingly supports the conclusion that Halford was discharged for a legitimate non-discriminatory reason. <u>See</u> <u>E.E.O.C. v.</u> <u>Beverage Canners, Inc.</u>, 897 F.2d 1067, 1071 (11th Cir. 1990) ("A defendant presented with direct evidence of discrimination in violation of Title VII can only successfully defend by showing by a preponderance of the evidence that the same decision would have been reached even without the discriminatory factor.").

\*\*\*

26

For the foregoing reasons, defendant WestPoint Home, Inc.'s motion for summary judgment will be granted in all respects.  An appropriate judgment will be entered.

DONE, this the 11th day of August, 2010.

                /s/ Myron H. Thompson
             UNITED STATES DISTRICT JUDGE